Filed 4/11/22  In re D.H. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re D.H., a Person Coming Under Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN'S AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.J. et al.,<br><br>        Respondents and Appellants. | A162672<br><br>(Contra Costa County Super. Ct. No. J19-00619) |

Two parents whose parental rights were terminated prior to the Supreme Court's recent decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) contend that the dependency court failed to consider the beneficial relationship exception to the statutory preference for adoption in the manner required by *Caden C.* Although we have found it necessary to remand other cases for reconsideration in light of *Caden C.*, the child in this case was removed from the care of her biological parents within days of her birth, so that she had little opportunity to develop a meaningful bond with them. In determining that the infant's interest in permanency and stability outweighed any benefit of retaining a relationship with her birth parents, the court considered the appropriate factors and none proscribed by *Caden C.*

1

Therefore, remand is unnecessary, and the termination order must be affirmed.

## Factual and Procedural History

When D.H. (Child) was born, she tested positive for cocaine, opiates, and marijuana and suffered symptoms of drug withdrawal. Mother identified Father as Child's alleged father.

Two days later, the Contra Costa County Children's and Family Services Bureau (the bureau) filed a petition alleging that Child came within the juvenile court's jurisdiction under Welfare and Institutions Code section 300, subdivision (b).[1] At a detention hearing three days later—when Child was five days old—the court found that the bureau had made a prima facie showing that Child's care and protection required her removal from parental custody; approved her placement with foster caregivers; and ordered paternity testing for Father and two hours of supervised visits per week for Mother. At a jurisdictional hearing a month later, the court sustained the section 300 petition as amended, based on the allegations of in utero drug exposure.

At a dispositional hearing in September 2019, the court adjudicated Child a dependent; approved her foster placement; ordered continued reunification services and one visit per week for Mother, but none for Father, who had not yet taken a paternity test; and set a six-month review hearing in March 2020. At a November 2019 status hearing, the bureau informed the court that Father had undergone testing that confirmed his paternity; the court deemed him Child's presumed father; and it ordered reunification

---

[1] All unspecified statutory citations are to the Welfare & Institutions Code.

services and a weekly one-hour visit for him. It also modified its prior order to provide for two, 2-hour visits per week for Mother.

In a report for the six-month review hearing calendared in March 2020, the bureau described Father's sporadic visits, unstable living situation, and comments suggesting he expected Mother, not himself, to reunify with Child. The report said that while Mother acted appropriately and lovingly in the visits she attended, she was missing some visits, struggling with sobriety, and failing to communicate. The bureau recommended terminating reunification services for both parents.

Mother contested the recommendation, and the court set a hearing that was continued to July 2020 as a result of the COVID shelter-in-place order. The bureau filed a report repeating its recommendation. The report noted Mother's lack of progress in drug treatment. It detailed how, in the preceding four months, she and Father had visited Child fairly regularly when in-person visits were possible but had each used only one or two opportunities to videochat with Child during the recent two-month period when in-person visits were suspended because of the pandemic.

After further continuances, the court held a hearing in September 2020 that it deemed a combined 6- and 12-month review, though Child was in fact 15 months old. The bureau modified its recommendation to request that services continue for Father. He had grown more cooperative after realizing that Mother was not "working her case plan" and that he "needed to step up to get [Child] back," emphasizing how much he wanted to do so.

At the September 2020 hearing, the court terminated services for Mother but continued them for Father until the 18-month deadline in December 2020. It found that Mother had visited Child consistently, and Father had done so "intermittently." The court ordered supervised visitation of two hours per week for Father and one hour twice per month for Mother. It

set an 18-month review hearing in December 2020, shortly before the 18-month services deadline.

For that hearing, the bureau submitted two reports that recommended terminating Father's services because of positive drug tests, missed tests, and a canceled appointment to arrange substance-abuse support. Father contested the recommendations, and the court set a contested hearing in January 2021. Contending that he had created a bond with Child through in-person visits and had substantially complied with his case plan, Father asked the court to exercise its discretion to allow him further services beyond the presumptive 18-month deadline and to continue visitation.

The court declined, noting that Father "ha[d] visited relatively regularly as far as in-person visits, but the reality is the glaring risk of detriment . . . related to substance abuse." The court found that the bureau had provided Father reasonable services, that his progress on his case plan had been "minimal," and that placing Child in his custody would create a substantial risk of detriment. The court terminated Father's reunification services, reduced his visitation to one hour per month, and scheduled a section 366.26 permanency-planning hearing on April 26, 2021. Father petitioned this court for writ relief, which this court denied. (*D.H. v. Superior Court* (Mar. 23, 2021, A161835) [nonpub. opn.].)

On April 8, the bureau submitted a report reciting that Child had lived with her foster caregivers for all but the first six days of her 22-month life and was happy, healthy, and thriving. It recommended terminating parental rights and setting a permanent plan of adoption: "Due to the sporadic and intermittent visitation and phone contact the parents have had with [Child], there is currently no parent/child relationship which outweighs the [benefits of the] permanency of adoption," and Child is in a home "with caring mothers who desire to adopt her."

4

On April 21, Mother filed a motion pursuant to section 388 to reinstate reunification services, which was calendared on April 26 along with the permanency-planning review. Mother submitted a statement claiming she had attained sobriety, found a permanent home, rebuilt supportive family relationships, and was successfully raising her two other children.

At the April 26 hearing, the court first addressed Mother's motion to reinstate reunification services and heard testimony from Mother about her visitation and current relationship with Child. The court denied the motion, finding that Mother's circumstances were changing but had not changed enough to warrant relief, and that it would not be in Child's best interest to resume reunification efforts.[2]

When the court turned to section 366.26, Mother and Father objected to the termination of parental rights. They asked the court to preserve their relationships with Child by appointing her foster caregivers as her legal guardians rather than permitting adoption. The court addressed the factors relevant to whether the beneficial-relationship expectation applied, after first noting that it had reviewed the bureau's report for the hearing and received it into evidence.

The report detailed how, in her 22 months in foster care, Child had roughly 62 in-person visits with Mother of one to four hours each (mostly two hours), while in the last 17 of those months, Child had roughly 33 in-person visits with Father of one to four hours each (mostly one or two hours). Many of the visits were joint, and several included Child's brother and half-sister. During the lockdown at the start of the pandemic in spring 2020, in-person visits were suspended for about eight weeks. Each parent was scheduled to videochat regularly with Child, but Father did so only once, and Mother

---

[2] Mother has not sought review of the denial of the section 388 motion.

5

twice. Father also had five phone or videochats in the fall of 2020, and he and Mother had one jointly in February 2021.

In sum, during her first 22 months of life, Child had had contact with Mother an average of about three times a month, and Father twice a month. She had never lived or had overnight visitation with either.

All accounts of the visits in the record are positive. The bureau's report includes notes on Mother's initial visits in June and July 2019 which state that she sang to Child and told her repeatedly that she was her "momma" and loved her, while cradling, feeding, and changing her. The report describes how, at Mother and Father's first joint visit, in December 2019, they "spoke lovingly to [Child], played with different toys, and danced to music." Other reports in the record positively describe other visits in December 2019 and January 2020, with Mother showing great care and affection and effective parenting, and Father attentive and affectionate. Another notes that, when in-person visits resumed in June 2020, Child had trouble adjusting and was prone to crying and fussiness, but Mother consistently tried to comfort her.[3] The reports also refer to Child showing affection for and appearing comfortable with Mother and Father.

In her testimony at the April 26 hearing, Mother said, "She knows me. Even though my visits has dropped down to once a month, she knows me. When she sees me she runs up to me . . . ," and "she extends her arms. She wants me to pick her up." The visits end, Mother testified, "by hugging and

---

[3] The bureau's reports for the July, September, and December 2020 review hearings focused on the parents' compliance with their case plans, but include notes positively describing Father's and Mother's visits with Minor in September–November 2020, in which each interacted attentively, sweetly, and playfully with Minor while caring for her needs.

she blows me kisses, and [in February 2021] when it was time for me [and my two other children] to walk off, [Child] tried to walk off with us."

After finding Child adoptable, the court addressed the evidence of her relationships with her parents: "I am mindful that both parents have visited with [Child] during the course of the last 22 months. [Mother], I think, has made . . . slightly more visits than [Father]. From reading the report and having listened to the testimony it appears that the visitation has generally gone well, but . . . it does not appear that there is a bond that is so significant that it would outweigh the benefit of permanence that adoption and termination [of parental rights] would provide."

The court adopted the bureau's recommendation to terminate parental rights and set a permanent plan of adoption. The court granted Mother's and Father's request for a final joint visit with Child.

Mother and Father each filed timely notices of appeal.

## Discussion

The sole issue raised by either parent[4] is whether the court abused its discretion in concluding that the beneficial parental relationship exception did not overcome the presumptive rule at a section 366.26 hearing in favor of adoption and termination of parental rights.

In *Caden C.* the Supreme Court explained the exception's application as follows: "Even when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly

---

[4] Father's brief joins in the legal arguments in Mother's brief while noting the rule that, if an order terminating parental rights is reversed as to one parent, it must also be reversed as to the other.

7

visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] . . . [T]he exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629–630.)

The court took pains to emphasize that, "[w]hen it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver . . . to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The juvenile court has necessarily already foreclosed that possibility by deciding that it must terminate reunification services. (*Id.* at p. 637.) When the court considers whether the beneficial relationship exception applies, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home," as opposed to an alternative permanent plan like guardianship that would not presumptively result in the cessation of contact with the parent(s). (*Id.* at p. 634.)

The court also emphasized that the rule is an exception to the abiding presumption in favor of adoption: If a juvenile court determines in a section 366.26 hearing that a child is adoptable, "then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] . . . '[T]he statutory exceptions

merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Id.* at pp. 630–631.)

The court added that the exception is "limited in scope." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) Quoting section 366.26, subdivision (c)(1)(B)(i), the court noted that it applies if " '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' " (*Ibid.*) From that text, the court "readily discern[ed] three elements the parent must prove to establish the exception: (1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Ibid.*, italics omitted.) The first, regular visitation and contact, "is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Id.* at p. 632.) "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] . . . [¶] Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose

9

adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at pp. 632–633.) Thus, the "subtle, case-specific inquiry" a court performs is to ask, "[D]oes the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Id.* at p. 633.)

Although the bureau disputes the sufficiency of the evidence to establish the first factor, and the court's ruling is ambiguous as to whether it found that either parent bore their burden of proof on the second element, we assume that the court implicitly made substantiated positive findings on both. After observing that "both parents have visited with [Child] during the . . . last 22 months," the court stated that, based on the evidence, "it appears that the visitation has generally gone well . . . ." The ultimate question remains whether the court abused its discretion when it found that it did "not appear that there is a bond that is so significant that it would outweigh the benefit[s] of [adoption]."

The *Caden C.* court devoted much of its analysis to disapproving decisions that had taken unduly restrictive approaches to the beneficial relationship exception by relying on factors not properly considered, or imposing heightened, nonstatutory requirements. (*Caden C., supra,* 11 Cal.5th at pp. 636–638 & fns. 5–7 [e.g., disapproving decisions treating "parent's continued struggles with the issues leading to dependency" as a "categorical bar to applying the exception"]. Nothing in the record suggests

10

that the juvenile court here relied on any such improper factors or applied any of the heightened standards rejected by *Caden C.*

Mother criticizes the bureau for failing to provide the court a qualitative evaluation of the nature of Child's relationship and interactions with her, as opposed to a quantification of the number of attended and missed visits. She notes that the court did not have the benefit of a bonding study of the sort *Caden C.* advises courts to consider. (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4.) But *Caden C.* advised juvenile courts to consider such studies "where requested and appropriate" (*ibid.*), and Mother apparently did not request such a study. Nor, given the age of the child, is there any indication that such a study would have been appropriate or helpful. Although the bureau's report for the section 366.26 hearing did not extensively describe Child's attitude towards Mother or Father, it included positive descriptions of several visits. And the bureau had previously submitted reports with extensive, detailed, positive descriptions of each parent's interactions with Child during many visits. These reports were reviewed by the same judge who conducted the section 366.26 hearing, and her ruling makes clear that she took those favorable reports into account in reaching her decision.

Mother also complains that the juvenile court's analysis was "cursory," and that it did not engage in the "subtle," detailed discussion required by *Caden C.* (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) But the comparison with the situation in *Caden C.* is inapt. That case involved a nine-year-old child who had a complex, emotionally intense relationship with the mother with whom he had lived for his first four years and for a later period of two years before his second removal. (*Id.* at p. 626.) The mother "discussed the case and her drug treatment in front of Caden," who in turn "talked about alcohol and drug use in detail," and who "reacted positively to living with [the foster

caregiver who sought to adopt him] but grew distressed at the prospect of not living with his mother." (*Id.* at p. 627.) The juvenile court considered reports from two psychologists who agreed that Caden had a very strong bond with his mother but disagreed about whether " 'the narrowness of the bond poses a risk to [Caden's] ability to devote his attention, energy, investment to developmentally appropriate tasks now of learning [and] socialization.' " (*Ibid.*)

In this case, by contrast, the juvenile court was required to consider the relationship of a 22-month-old child with the birth parents with whom she had never lived or had an overnight visit, but with whom she had had visits of a few hours each, albeit positive, over the course of her short life. The court recognized and undoubtedly sympathized with the love the birth parents had for the child. However, in finding that terminating parental rights would not be detrimental to Child, at least far less so than losing the benefits she would receive from adoption by loving foster parents who had cared for her since she was a week old, the court made a difficult decision, but it certainly did not abuse its discretion.

We, too, acknowledge the anguish this decision must cause the biological parents. However, at this point, after the child has been in the positive care of her foster parents for almost three years, we are compelled to affirm the dependency court's decision that this is indeed in the child's best interest.

## Disposition

The order terminating parental rights and establishing a permanent plan of adoption is affirmed.

POLLAK, P. J.

WE CONCUR:

BROWN, J.
DESAUTELS, J.[*]

---

[*] Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.